UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                   :
AMARIS MESA et al.,                                :
                              Plaintiffs,          :
                                                   :          09 Civ. 10464 (JPO)
                  -v-                              :
                                                   :          MEMORANDUM AND
THE CITY OF NEW YORK et al.,                       :                ORDER
                              Defendants.  :
                                                   :
                                                   :
-------------------------------------------------------------X


J. PAUL OETKEN, District Judge:

        This is a civil rights action in which Plaintiffs Amaris Mesa, Dennis Flores, and

Zhandarka Kurti assert multiple claims—primarily under 42 U.S.C. § 1983, together with

pendent state law claims—against New York City, the New York City Police Department, three

individual police officers, and seventeen unknown police officers (collectively "Defendants").

Defendants have moved for summary judgment on all of Plaintiffs' claims, and Plaintiffs have

cross-moved for summary judgment with respect to their claims arising out of one of the two

incidents at issue in the instant action.

        For the reasons that follow, Defendants' motion for summary judgment is granted in part

and denied in part, and Plaintiffs' motion is denied in its entirety.

**I.      Background**

        The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and

other summary judgment submissions in connection with the instant motions, and are undisputed

unless otherwise noted.

The claims in this action arise out of two separate events, occurring on September 29, 2008 and April 16, 2010.  Plaintiffs Amaris Mesa ("Mesa"), Dennis Flores ("Flores"), and Zhandarka Kurti ("Kurti") filed suit against Defendants New York City Police Department (the "NYPD"), the City of New York ("the City"), Officers Aida Dolan ("Dolan"), Monica Delvalle ("Delvalle"), Sergeant Derrick Milligan ("Milligan"), and seventeen unknown NYPD Officers ("John Does"). (*See* Second Amended Complaint ("Compl."), Dkt. No. 22.)

## A.    The St. Michael's Day Celebration

On September 29, 2008, Mesa and Flores (for the purposes of this section, together "Plaintiffs") attended a festival in front of a botanica[1] in Kingsbridge, Bronx County. (Defendants' Local Rule 56.1 Statement, Dkt. No. 44, at ¶ 1; Plaintiffs' Response to Defendants' Local Rule 56.1 Statements, Dkt. No. 51.)  The festival was a cultural celebration in honor of St. Michael's Day.  (Diamant Decl., Deposition Transcript of Amaris Mesa ("Mesa Dep."), Dkt. No. 49, Ex. A., at 67:24, 68:1-3.)  Approximately 300-500 people attended the event,[2] and drumming and music were involved in the celebration.  (Dkt. No. 51, at ¶ 6; Flores Dep., at 85:14-86:24.) While the parties agree on the approximate number of attendees at the event, they disagree as to whether the crowds were confined to the sidewalks at all times or instead spilled into the street. Plaintiffs contend that traffic moved freely and no individuals blocked the street at any time. (Dkt. No. 51, at ¶ 8.)

---

[1] According to Flores, a botanica is a "storefront for religious items," such as "crosses, herbs, [and] candles." (Diamant Decl., Deposition Transcript of Dennis Flores ("Flores Dep."), Dkt. No. 49, Ex. B, at 80:7-10.)

[2] Plaintiffs contend that the event was cultural and spiritual in nature, while Defendants refer to the gathering as a "Santeria party" or "street festival." (*Compare* Diamant Decl., Deposition Transcript of Elaine Eversley ("Eversley Dep."), Dkt. No. 49, Ex. C, at 39:16-22, *and* Flores Dep., at 83:8-19, *with* Chen Decl., Deposition Transcript of Monica Delvalle ("Delvalle Dep."), Dkt. No. 47, Ex. F, at 39:9, 46:18-21.)

There is some dispute as to whether an official license from the NYPD Community Affairs Bureau was necessary for such an event. Plaintiffs assert that that while the botanica's owner did not obtain an official permit for the celebration, such a license was unnecessary, because the NYPD has a "history of informally permitting gatherings that are without formal City-issued permits." (*Id.* at  ¶ 3.) In any event, the gathering lacked an official city permit, but obtained leave from Community Affairs Officer Wilson Hernandez ("Hernandez"), who reached an "informal verbal accommodation" with the botanica owner, to remain active until 8:00 PM on the evening of September 29. (*Id.* at ¶¶ 4-5.)

Officers Dolan and Delvalle were undisputedly dispatched to patrol the area during the event. (*Id.* at ¶ 9.) Dolan noted that her role during the event was to "keep order and keep presence" (Chen Decl., Deposition Transcript of Aida Dolan ("Dolan Dep."), Dkt. No. 47, Ex. E, at 67:5-10), and she recalls requesting multiple times that attendees move from the street to the sidewalk. (*Id.* at 66:20-24, 67:13-68:17.) Plaintiffs dispute that attendees milled in the street of their own accord, and contend that the officers' role was to patrol the event rather than to ensure that the crowd stayed on the sidewalk. (Dkt. No. 51, at ¶ 9.)

Pursuant to the informal accommodation between Hernandez and the botanica owner, the police, including Dolan and Delvalle, began dispersing the crowd after 8:00 PM. (*Id.* at ¶¶ 11-12.) The particular occurrences giving rise to the instant action all derive from events that took place during this evening dispersal period. From this point in the evening on, the parties' accounts differ significantly.

Whereas Dolan and Delvalle assert that they dispersed the crowd only verbally, Plaintiffs contend that the officers physically dispersed the crowd with their nightsticks and asps,[3] pushing certain attendees while doing so. (*Compare* Dolan Dep., at 71:16-72:6, *and* Delvalle Dep., 58:2-8, *with* Flores Dep., at 88:5-24, 91:15-25, *and* Mesa Dep., at 81:1-9, 83:5-10.) However, neither of the Plaintiffs alleges that either Dolan or Delvalle came into contact with them with a nightstick or asp. (*See, e.g.*, Mesa Dep., at 83:9-18.)

Dolan and Delvalle also state that neither of the Plaintiffs complied with the instructions to disperse. Dolan notes that Mesa did not seem amenable to dispersing, and contends that Mesa also swore at her, alleging that Mesa said something to the effect of "You can't f***ing tell me what to do." (Dolan Dep., at 86:12-16.) Mesa disputes this allegation, and instead claims that she and her group, which included Flores, were dispersing in an orderly fashion, at which point they were pursued and harassed by Dolan and Delvalle. (Mesa Dep., at 83:21-85:3.) And while Plaintiffs concede that the scene was "hectic" (*id.* at 85:12-17), the picture painted by Mesa and Flores differs significantly from that described by Dolan and Delvalle. Whereas Plaintiffs describe a peaceful, calm event that dispersed in an orderly fashion by 8:00 PM (*see, e.g.*, Flores Dep., at 90:4-7), Defendants instead portray a scene where multiple attendees failed to heed directions to stay on the sidewalk during the event, and later, to disperse. (Dolan Dep., at 66:20-24, 77:14-16.)

The circumstances under which Dolan and Delvalle encountered Mesa and Flores are hotly contested. Plaintiffs argue they were leaving the event calmly. In contrast, Defendants state that Plaintiffs refused dispersal orders. However, it is undisputed that at some point during this

---

[3] An asp is an extendable baton sometimes used by police.

incident, Flores took a flash photograph of Dolan.[4] (Dkt. No. 51, at ¶ 14.) Dolan contends that after the flash photograph, she told Plaintiffs to continue to disperse, but they refused, and Mesa then swore at her instead of leaving the scene. (Dolan Dep., at 90:8-22.)

Plaintiffs' account is quite different. Flores asserts that he took the photograph on his way home, after interacting briefly with Delvalle, to document Dolan's rough behavior in dispersing the crowd. (*See* Flores Dep., at 95:12-96:2.) Flores states that after he took the photograph, Dolan jokingly said to him "Why didn't you tell me you was [sic] going to take my picture? I would've given you my good side." (*Id.* at 99:2-16.) Flores contends he was seven to ten feet away from Dolan at the time of the photograph (*id.* at 99:17-23), while Delvalle argues that he was much closer to Dolan, "up . . . to her face." (Delvalle Dep., at 63:11-12.) At the time the photograph was taken, Mesa was walking alongside Flores (Flores Dep., at 96:14-16), and the officers testified that despite the photograph they continued only to ask Plaintiffs to disperse and keep moving, which Plaintiffs allegedly failed to do. (Delvalle Dep., at 63:11-14; Dolan Dep., at 86:9-13, 88:4-10.)

At some point following the taking of the photograph, Plaintiffs Flores and Mesa were each arrested around the same time. Flores contends that he was able to view Mesa's arrest while detained against a glass wall by police. (Flores Dep., at 124:3-20, 125:17-128:13.) Mesa agrees that she was arrested before Flores. (Mesa Dep., at 97:8-99:8.) And Dolan states that as she remembers it, Flores was arrested for behavior that took place after Mesa's arrest. (Dolan Dep., at 99:8-15.)

---

[4] A copy of this photograph can be found as an exhibit to Plaintiffs' motion for summary judgment. (Diamant Decl., Dkt. No. 49, Ex. H.)

Flores contends that in the minutes following the photograph, Dolan and other Defendants pursued his group, with Dolan yelling that it was "illegal to photograph Police" and calling for his arrest. (Flores Dep., at 119:24-120:9.) Flores alleges that he passed his camera to one of the women in his group and put his hands up to comply with Dolan's orders. He states he was then pushed into the glass of a restaurant by unidentified John Doe officers with such force that the glass began to shake. But he admits that the officers ceased pushing him into the glass upon request. (Flores Dep., at 120:22-123:1.)[5]

Dolan alleges that after Mesa swore at her and refused to move, she approached Mesa, requesting identification so as to issue a summons for disorderly conduct. (Dkt. No. 51, at ¶¶ 14-15.) Mesa states that she was never asked for identification, but instead was pursued by Dolan because she was now in possession of Flores' camera. (Mesa Dep., at 99:3-9.) Mesa alleges that Dolan "lunged" for the camera (*id.* at 100:22-101:4), and that in response to the lunge, Mesa stated: "Are you serious?" (*Id.* at 101:5-6.) A struggle for the camera allegedly ensued, during which Mesa contends she was pushed into Dolan by an unknown bystander. (*Id.* at 101:18-103:3.) Both parties agree that Mesa made contact with Dolan, but there is a dispute as to whether Mesa was pushed into Dolan (*id.* at 103:1-24), or hit Dolan purposefully. (Dolan Dep., at 91:10-20; Delvalle Dep., at 70:6-25.)

After making contact with Dolan, Mesa claims that officers called her names and jumped on top of her, bearing her to the ground in an attempt to handcuff her. Mesa states that she did not resist arrest in any fashion. (Mesa Dep., at 104:4-106:19.) Flores and two bystanders from Plaintiffs' group confirm Mesa's account that she was forcefully taken into custody by several

---

[5] Two photographs taken by non-party witness Rocio Silverio document Flores' arrest. In the photographs he can be seen resting his hands up against a glass pane. (Chen Decl., Dkt. No. 47, Exs. U & V.)

John Doe officers (Flores Dep., at 127:1-128:13; Eversley Dep., at 71:7-19; Diamant Decl., Deposition Transcript of Rocio Silverio ("Silverio Dep."), Dkt. No. 49, Ex. F, at 52:25-53:6), whereas Delvalle and Dolan contend that Mesa resisted consistently after the initial altercation, stating that officers had difficulty subduing her. (Dolan Dep., at 91:20-92:7, 98:17-19.) It is undisputed that, as a result of her arrest, Mesa suffered two bruises on her arms. (Dkt. No. 51, at ¶ 20.)

As a result of the incident, Mesa was issued a C summons and "processed for a misdemeanor arrest." She was charged with resisting arrest, harassment, and two counts of disorderly conduct. She was also issued a separate C summons for disorderly conduct, under New York P.L. § 240.20(6). (Dkt. No. 51, at ¶ 45; Chen Decl., Misdemeanor Arraignment Report & Summons #431844246-9, Dkt. No. 47, Exs. N & O.) Mesa was found not guilty of the misdemeanor arrest charges before Judicial Hearing Officer Davidowitz in November 2009. However, in her trial before Judicial Hearing Officer Quattrochi on the summons charge for disorderly conduct, the Hearing Officer deteremined that she was "guilty," but issued her an adjournment in contemplation of dismissal. She moved to have this judgment vacated, but New York State Supreme Court Justice Alvarado denied her motion in April 2011. (Dkt. No. 51, at ¶ 46; Chen Decl., Alvarado Order, Dkt. No. 47, Ex. Q.) As a result of the September 28 incident, Flores also was issued a summons for disorderly conduct pursuant to § 240.20(6). At his trial before Judicial Hearing Officer Quattrochi, Flores was found not guilty. (Chen Decl., Certificate of Disposition No. 12514, Dkt. No. 47, Ex. R.) The parties agree that Flores suffered no physical injuries due to his arrest. (Dkt. No. 51, at ¶ 26.)

### B.    The April 16, 2010 Precinct Incident

The second incident giving rise to the claims in this action occurred on April 16, 2010, at the 43rd Precinct ("the Precinct"), located in Bronx County, New York. The two individual plaintiffs involved in these particular claims are Flores and his girlfriend, Kurti (for the purposes of this section, "Plaintiffs"). The causes of action associated with this incident are asserted against Dolan, the NYPD, the City, other John Doe officers, and Milligan. Again, while certain facts are undisputed, the parties' respective accounts of the events that occurred at the Precinct differ significantly.

As part of the commencement of this action, Flores asked Kurti to serve process on Dolan at the Precinct. (Dkt. No. 51, at ¶ 27.) When Kurti first arrived at the Precinct, the desk sergeant told her that Dolan was not present at the time. After hearing this information, Kurti left the Precinct to speak with Flores, who was waiting outside. Flores told Kurti to go back inside the Precinct in another attempt to see Dolan, and Kurti complied. (*Id.* at  ¶¶ 28, 29.) Kurti was told again by the desk sergeant that Dolan was not at the Precinct (*id.* at  ¶ 30), at which point the desk sergeant probed Kurti regarding the reason for her visit. (Quackenbush Decl., Deposition Transcript of Zhandarka Kurti ("Kurti Dep."), Dkt. No. 55, Ex. C, at 73:10-14.) In response to the desk sergeant's query, Kurti said that Dolan had helped her in the past with a complaint, which she admitted in her deposition was not in fact the case, but rather, was a statement made to ensure Dolan's appearance. (Kurti Dep., at 73:11-74:9.) As a result of his conversation with Kurti, the desk sergeant called Dolan into the Precinct, and she arrived shortly thereafter. When Dolan returned, Kurti handed her the papers and stated that Dolan had been served on behalf of Mesa and Flores. (*Id.* at 74:19-23.)

8

After serving Dolan, Kurti proceeded to leave the Precinct, meet Flores across the street, and walk toward the bus stop. (*Id.* at 74:24-75:21.) Upon receipt of the papers, Dolan went to her supervisor, Milligan, and explained what had occurred. In response, Milligan informed Dolan that this procedure was not the proper one for serving a police officer. (Quackenbush Decl., Deposition Transcript of Derrick Milligan ("Milligan Dep."), Dkt. No. 55, Ex. E, at 34:3-35:2, 38:16-39:19.) Putting aside whether Milligan's statement was correct as a legal matter,[6] the parties do not dispute that Milligan believed service to be improper, when made in person to a police officer and when a process server fails to provide identification upon request. (Dkt. No. 51, at ¶ 32.) The parties also agree that following their conversation, Dolan and Milligan walked toward Kurti, meeting with both Flores and Kurti in the street. Flores undisputedly filmed the interaction, during which Milligan informed Plaintiffs that there is a proper procedure for serving a police officer, and that they needed to return to the Precinct to complete the process. (*Id.* at ¶¶ 34, 35, 37.) At this juncture, all four parties returned to the Precinct.[7] The parties' respective accounts of the events that occurred inside the Precinct diverge dramatically.

Back at the Precinct, the parties agree that Milligan asked Kurti for her identification. (*Id.* at ¶¶ 40, 41.) However, the factual consensus ends there. Milligan contends that upon requesting Kurti's identification, she refused to comply with his request several times (Milligan

---

[6] It appears that the NYPD Patrol Guide Procedure No. 211-21, which addresses lawsuits against its officers, does not address the procedures to which Milligan referred. It does not require that an officer obtain identification from the process server, and simply provides a guideline for desk sergeants when a process server arrives and asks to serve a particular officer. (Chen Decl., NYPD Patrol Guide Procedure No. 211-21, Dkt. No. 47, Ex. M.)

[7] Flores has placed a video of this encounter on YouTube, and Plaintiffs cite the video throughout their filings, listing the video as an exhibit. (Quackenbush Decl., Video, Dkt. No. 55, Ex. F.) The video is available on the Internet at: http://www.youtube.com/watch?v=_x1Ey-dPFRg.

Dep., at 50:23-54:8), and eventually threw the papers in Dolan's direction. (*Id.* at 55:15-56:2.) Dolan also alleges that she heard Kurti yelling at Milligan during this interaction. (Dolan Dep., at 151:11-16.) Milligan states that he saw Flores walking throughout the Precinct, attempting to film the entire interaction (Milligan Dep., at 54:9-55:8, 57:11-25), at which point he claims that he placed Flores under arrest. Plaintiffs dispute both the sequence and substance of these interactions. According to Kurti, Milligan did not give her time to comply with his identification request, and instead, arrested Flores in retaliation for her demand to see the paperwork he continued to cite as a necessary aspect of proper service, never giving her a chance to present her identification. (Kurti Dep., 89:17-19, 91:20-93:5.)

Kurti states that after Flores' arrest, she again took the papers and told Milligan that she had properly served them on Dolan, noted that she had Milligan's name and badge number, and then proceeded to leave the Precinct. (*Id.* at 95:14-97:3.) At this point, Kurti alleges that Milligan followed her out of the precinct and attempted to give the summons and complaint back to her, which she refused. Next, she claims, Milligan grabbed her arm and brought her back to the Precinct, where she was handcuffed and arrested (*Id.*, at 97:17-99:24.) Defendants, in addition to contending that Kurti was yelling inside the precinct and very unruly, allege that she never left the Precinct or was brought back inside by Milligan. (Defendants' Counter-Rule 56.1 Statement in Opposition to Cross-Motion for Summary Judgment, Dkt. No. 62, at ¶ 21.)

Flores states that he did not harass Dolan inside the Precinct, nor did he film once inside the building. Instead, Flores argues that he was seated inside the Precinct calmly, contending that Milligan merely assumed he was filming, and threw his bag off his lap in an attempt to find the camera. (Flores Dep., at 167:10-168:8.)

Kurti alleges no injuries for which she sought medical attention due to these events, but she claims that her handling by Milligan and Dolan during the arrest caused her pain. (Kurti Dep., at 113:12-114:25.) Flores alleges no physical injuries associated with the April 16 incident. (Dkt. No. 51, at ¶ 43.) However, both Kurti and Flores allege emotional injury associated with the events in the Precinct. (Kurti Dep., at 129:1-23; Flores Dep., at 200:25-201:18.) After their arrests, Kurti and Flores were each issued a summons associated with harassment charges, under New York P.L. § 240.26(3). The charges against Plaintiffs were both dismissed. (Chen Decl., Certificates of Disposition Nos. 12193 and 12194, Docket No. 47, Exs. S & T.)

## II.     Legal Standard

### A.     Summary Judgment

A court may not grant a motion for summary judgment unless all of the parties' submissions, read together, reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). The moving party bears the burden of "establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). In contrast, it is the non-movant that benefits from the Court's construction of all facts, and the resolution of all ambiguities, in its favor. *See Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) ("In determining whether summary judgment is appropriate, this Court will 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" (internal citations omitted)).

While a court must construe the facts "in the light most favorable" to the non-movant, *id.*, it must also "dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477

U.S. 317, 323-24 (1986). Courts must deny a motion for summary judgment whenever reasonable jurors could disagree as to the result, but it bears mentioning that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### B.  Qualified Immunity

Where police officers are sued in their individual capacities for alleged rights violations, they are entitled to qualified immunity with respect to certain discretionary actions. *Cerrone v. Brown*, 246 F.3d 194, 198-99 (2d Cir. 2001). Such an officer is immune from suit, and accordingly, from civil liability, if *either*: (1) "his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *id.* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)), *or* (2) "it was 'objectively reasonable for him to believe that his actions were lawful at the time of the challenged act.'" *Id.* (quoting *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (internal citation and quotations omitted)).

Thus, even where the right violated is both clearly established and well known, such that a reasonable officer would be aware of its existence, liability is not absolute. *See Anderson v. Creighton*, 483 U.S. 635, 639 ("For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation.").

This rule, which looks to the objective reasonableness of the challenged act, even where it is violative of clearly established law, ensures that plaintiffs cannot "convert the rule of

qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* at 640. In this analysis, an officer's subjective beliefs and motivations are, in fact, irrelevant. Instead, courts determine only whether a jury could find that "'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon,* 66 F.3d at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). And wherever courts so find, summary judgment on qualified immunity grounds is appropriate. *Id.*

Importantly, while summary judgment demands that all facts be construed in the light most favorable to the non-movant, officers themselves may make "reasonable inferences from the facts they possess at the time of [an alleged violation] based upon their own experiences." *Cerrone*, 246 F.3d at 203. Thus, a movant's fact narrative, though not dispositive, remains relevant to the qualified immunity inquiry at the summary judgment stage. And summary judgment on the basis of qualified immunity will be appropriate "when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997). Additionally, "[q]ualified immunity is an affirmative defense. The burden rests on the defendants to raise the defense in their answer and to establish the defense on a motion for summary judgment or at trial." *Lee v. Sandberg*, 136 F.3d 94, 101 (2d Cir. 1997).

While the order of analysis within the qualified immunity inquiry was formerly mandatory, *Saucier v. Katz*, 533 U.S. 194 (2001), with courts first considering whether the violation asserted constituted an infringement of a constitutional right, and only then examining whether the allegation flouted clearly established law, the Supreme Court modified this framework in *Pearson v. Callahan*, 555 U.S. 223 (2009). *Id.* at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in

13

deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *see also Camreta v. Greene*, 131 S.Ct. 2020, 2032 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials."). Thus, courts may examine the two prongs of the qualified immunity analysis in the way that best suits the particular inquiry associated with a given set of facts.

## III.   Discussion

### A.   Parties to the Action

At the outset, summary judgment must be granted in favor of Defendants with respect to all claims against the NYPD. In determining whether the arm of a municipality may be sued, courts look to state law. Fed. R. Civ. P. 17(b)(3). Given that it is a "subdivision of the City of New York, it has long been held that the NYPD is not a suable entity." *Mendez v. City of New York Human Resources Admin.*, No. 04 Civ. 0559, 2005 WL 2739276, at *3 (S.D.N.Y. Oct. 24, 2005); *see also East Coast Novelty Co., Inc. v. City of New York*, 781 F. Supp. 999, 1010 (S.D.N.Y. 1992) ("As an agency of the City, the Police Department is not a suable entity."). In fact, the New York City Charter provides that actions for the recovery of penalties for the violation of laws "shall be brought in the name of the City of New York and not in that of any agency," unless the law otherwise provides. *Id.* Accordingly, summary judgment must be granted for Defendant NYPD.

Additionally, as to the seventeen unnamed John Does listed as Defendants in the instant action, all charges against them are dismissed. The Second Amended Complaint in this action

was filed on October 5, 2010 (Compl., Dkt. No. 22), and discovery closed on December 7, 2011.

(Endorsed Letter, Dkt. No. 38.) Plaintiffs have had sufficient time to identify and serve the Doe

Defendants, and at this juncture, it is appropriate to dismiss those Defendants as parties to this

case. Accordingly, this Court will evaluate Plaintiffs' claims only against the individual, named

officers—Dolan, Delvalle, and Milligan. Moreover, though Plaintiffs  assert a *Monell* cause of

action against the City, those claims have been stayed pending resolution of the parties' other

claims pursuant to a prior order, and will not be considered here. (Order, Judge Castel, Dkt. No.

32.)

### B.  The St. Michael's Day Celebration

#### 1.  False Arrest and False Imprisonment

Plaintiffs Flores and Mesa both allege that they were falsely arrested and imprisoned in

violation of their constitutional rights during the St. Michael's Day celebration in September

2009. They assert these claims against Dolan and Delvalle, and appear to allege constitutional

violations under 42 U.S.C. § 1983, along with the state law analogs of false arrest and false

imprisonment. The officers invoke qualified immunity as a defense to the federal claims.

(Defendants' Memorandum of Law in Support of Summary Judgment, Dkt. No. 46, at 3-4.)

A § 1983 claim alleging arrest without probable cause is "substantially the same as a

claim for false arrest under New York law," *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996),

and thus, with respect to both the constitutional claim and the state law tort, probable cause

operates as a complete defense. *See id.* at 852 ("The existence of probable cause to arrest

constitutes justification and 'is a complete defense to an action for false arrest,' whether that

action is brought under state law or under § 1983." (quoting *Bernard v. United States,* 25 F.3d

98, 102 (2d Cir.1994) (internal citation omitted)). "If, following [an] arrest, the plaintiff was

convicted of the charges against him, that conviction normally 'would be conclusive evidence of probable cause.'" *Weyant*, 101 F.3d at 852 (quoting *Broughton v. State*, 37 N.Y.2d 451, 458 (N.Y. Ct. App. 1975)).

In the context of qualified immunity, the probable cause standard is further refined. Though probable cause is a complete defense to false arrest or false imprisonment, an officer remains immune from suit so long as he had "arguable probable cause" to effectuate the seizure. *See Cerrone*, 246 F.3d at 202 ("The appellants correctly point out that to be entitled to qualified immunity, they need only have possessed 'arguable' probable cause to seize [Plaintiff], not actual probable cause."). In other words, actual probable cause,[8] while a complete defense to a false arrest claim, is not necessary in order for qualified immunity to attach for officers' discretionary acts.

Arguable probable cause is present wherever "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law." *Lee*, 136 F.3d at 102 (quotations omitted). The relaxation of classic probable cause in these instances reflects the inevitability of the fact that "law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Cerrone*, 246 F.3d at 202.

Therefore, so long as an officer's actions are objectively reasonable in light of the factual circumstances at hand, he will remain immune from suit, whether or not probable cause *actually* existed. Put another way, an arresting officer is "entitled to summary judgment on qualified

---

[8] An officer has probable cause to arrest when in possession of facts "sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Gerstein v. Pugh,* 420 U.S. 103, 111 (1975) (internal quotations omitted)).

immunity grounds if [his] actions were not objectively unreasonable at the time they were taken," which courts in this Circuit have understood to mean that *either*: "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Lee*, 136 F.3d at 102 (quotations omitted); *see also Golino v. New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

Additionally, a claim for false arrest "turns only on whether probable cause [or arguable probable cause] existed to arrest a defendant," meaning that "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006). In other words, the inquiry turns to the "validity of the arrest," not the validity of each, individual charge. *Id; see also Devenpeck v. Alford*, 543 U.S. 146 (2004).

Under both federal and state law, false arrest constitutes false imprisonment "accomplished by means of an unlawful arrest"; the claims of false arrest and imprisonment are thus "largely synonymous because an imprisonment starts at the moment of arrest." *Jenkins v. New York*, 478 F.3d 76, 88 n.10 (2d Cir. 2007). A plaintiff asserting a false arrest or false imprisonment claim must, at bottom, make a showing that the defendant "intentionally confined him without his consent and without justification." *Weyant*, 101 F.3d at 852. Specifically, a plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard*, 25 F.3d at 102 (internal quotations omitted)).

### Mesa's Federal Claims

It is undisputed that both Mesa and Flores were arrested, handcuffed, and detained by Defendants. Thus, summary judgment will not be appropriate here unless, at the very least, arguable probable cause existed.

While it is no doubt clearly established law that officers may not arrest and detain citizens absent probable cause, *see Katz v. United States*, 389 U.S. 347 (1967), Judge Quattrochi issued Mesa an adjournment in contemplation of dismissal ("ACD") with respect to the summons she was issued after her September 28, 2009 detention. (Chen Decl., Exhibit P, at 22: 18-21.)  On the record, before giving Mesa an ACD, Judge Quattrochi found that the officers in fact had probable cause to arrest Mesa that night, as she was guilty of disorderly conduct.  (*See id.* ("The Court: Thank you, I heard enough. Based on the credible evidence of the officer, I find you guilty as charged, but I will give you an ACD."). This state court finding constitutes conclusive evidence that Dolan and Delvalle had probable cause for detaining and arresting Mesa during the celebration dispersal.

And where an arrest is effectuated with probable cause, a false arrest claim will not lie. Moreover, a constitutional arrest is necessarily privileged, meaning the fourth element of the false imprisonment claim—that the arrest not be otherwise privileged—is not met. Thus, given the existence of probable cause for Mesa's arrest, the officers are entitled to qualified immunity with respect to her false arrest and imprisonment claims. It does well to note that with respect to the summons-related charge, Mesa indeed was given an ACD.  However, as a matter of law, ACDs are not considered terminations "favorable to the accused," *Murphy v. Lynn*, 118 F.3d 938, 948-49 (2d Cir. 1997), and thus, are not necessarily indicative of innocence. And while New York law does not require favorable termination as an element of a false arrest claim, *Weyant*,

18

101 F.3d at 853-54, in Mesa's case, the fact that Judge Quattrochi found her guilty is not itself nullified by the ACD. *Cf. Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) ("For example, under New York law, an 'adjournment in contemplation of dismissal,' *i.e.,* a conditional dismissal that becomes final 6-12 months thereafter if the court has not in the interim, on motion of the prosecutor, restored the case to the calendar . . . , is not a favorable termination because it leaves open the question of the accused's guilt." (internal citations omitted)). Mesa also was unsuccessful in vacating her ACD, thus solidifying the probable cause finding. (Chen Decl., Exhibit Q.)

   With respect to the charges associated with Mesa's misdemeanor arrest,[9] there is no question that Judge Davidowitz's found her "not guilty." However, false arrest and imprisonment turn on the validity of the *initial* detainment, rather than on the *ultimate disposition* of the charges, as probable cause forms the heart of the inquiry, rather than the eventual result at trial. *Cf. Loria v. Gorman*, 306 F.3d 1271, 1288-89 (2d Cir. 2002) ("[P]robable cause is an assessment of probabilities, not an ascertainment of truths."); *Lee*, 136 F.3d at 102-03 (explaining that the circumstances giving rise to probable cause exist independently of the ultimate validity of the allegations within a given complaint). Given that an officer may defend a false arrest and imprisonment charge with the defense of probable—or in the case of qualified immunity, arguable probable—cause, Judge Quattrochi's finding of Mesa's guilt on the disorderly conduct charge in the C Summons is conclusive evidence that probable cause existed for Mesa's arrest. As discussed *supra*, under *Jaegly* and *Devenpeck*, the officers need not have possessed probable

---

[9] Mesa's misdemeanor arrest included three charges: Resisting Arrest, Harassment in the Second Degree, and two counts of Disorderly Conduct in violation of N.Y. Penal Law §§ 240.26(1), 205.30, 240.20(1),(6).

cause for every charge listed on the misdemeanor arrest instrument, but rather, probable cause for *a* charge—probable cause which existed given Judge Quattrochi's finding. *Accord Cameron v. Fogarty*, 806 F.2d 380, 389 (2d Cir. 1986) ("Whether or not the facts surrounding the officers' encounter with [Plaintiff] on Eighth Avenue amounted to probable cause for his arrest, the conviction of Cameron of the offense for which he was arrested gives the officers a complete defense to the present suit.").

However, assuming Mesa did spend more time in custody due to the misdemeanor arrest processing than she would have had she only be processed for the single C summons, perhaps giving rise to an independent false arrest or imprisonment claim, in the alternative, it is appropriate to address briefly the question of reasonableness regarding these other charges: namely, whether, under the "arguable probable cause" standard, the arrest and detainment of Mesa for harassment, resisting arrest, and disorderly conduct were reasonable in light of her conduct during the St. Michael's Day Celebration. For the purposes of this inquiry, this Court must use Plaintiffs' version of the facts, while bearing in mind that the qualified immunity standard allows a certain degree of leeway for defendants who act with objective reasonableness. *See Cerrone*, 246 F.3d at 203-04 ("We hold that the law in 1995 was clearly established that seizure of a police officer in the context of a criminal investigation required probable cause on the part of the seizing officers. We also hold that the officers may be entitled to qualified immunity if they had arguable probable cause for the seizure, thus rendering their conduct objectively reasonable.").

Mesa admits to making physical contact with Dolan's body. She also describes a physical struggle over Flores' camera. And while Mesa disputes Dolan's contention that she cursed at the officers, refusing to disperse from the area peacefully, she does admit to asking Dolan "Are you

20

serious?" during the struggle for the camera.[10] Assuming that Mesa was indeed leaving peacefully from the celebration at the time of the incident, and inadvertently stumbled into Dolan, the objective question remains: would a reasonable officer, under similar circumstances, have believed she had probable cause to arrest Mesa?

It is well established that officers are not required to "sit as prosecutor, judge, or jury" when determining probable cause. *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989). Police officers are not expected to "explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Martinez v. Simonetti*, 202 F.3d 625, 635 (2d Cir. 2000). Due to the fast-paced decisions that law enforcement officers are often required to make, mistakes are sometimes unavoidable. Put simply, there are times where law enforcement officers may reasonably conclude that probable cause exists, when it in fact does not. *See Anderson*, 483 U.S. at 641 ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful— should not be held personally liable."). Qualified immunity protects such officers from liability associated with actions that they reasonably conclude are lawful, even when they are not. *Cf. Graham v. Connor*, 490 U.S. 386, 397 (1989) (explaining that courts must make "allowance for the fact that police officers are often forced to make split-second judgments").

Given the forcible contact that Mesa made with Dolan's body—inadvertent or not— together with the altercation over the camera and the exchange of words between the two, it is

---

[10] *See supra*, Section I.A, at 5. The Court recognizes that the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987). However, Mesa's comment is mentioned in order to further elucidate both the situation in which Dolan and Delvalle operated on the night in question, and the events leading up to the Mesa arrest.

beyond genuine dispute that a reasonable officer could have believed that probable cause existed to arrest Mesa for at least one of the misdemeanor offenses listed in Arraignment Report #2008BX058454. (Chen Decl., Exs. N & O.) Thus, even though the three misdemeanor charges were eventually dismissed against Mesa, Dolan and Delvalle are nevertheless immune from suit with respect to her false imprisonment and false arrest claims.

In New York, resisting arrest is defined as "intentionally prevent[ing] or attempt[ing] to prevent a police officer or peace officer from effecting an authorized arrest of himself or another person." N.Y. Penal Law § 205.30. Harassment in the second degree, the second count of Mesa's misdemeanor summons, is partially defined as "strik[ing], shov[ing], kick[ing], or otherwise subject[ing] such other person to physical contact, or attempt[ing] or threaten[ing] to do the same." N.Y. Penal Law § 240.26(1). Disorderly conduct is defined as: "enga[ging] in fighting or in violent, tumultuous, or threatening behavior;" or "congregat[ing] with other persons in a public place and refuses to comply with a lawful order of the police to disperse." N.Y. Penal Law § 240.20(1), (6).

Even under Plaintiffs' version of the facts, the officers arrested her after she made some kind of physical contact with Dolan. Moreover, Mesa admits to a hostile verbal exchange with Dolan. Undisputedly, these events occurred in the evening, as officers attempted to disperse a crowd of several hundred individuals. Even if Mesa had been accidentally pushed into Dolan, as she claims, at the time, it was reasonable for Dolan to perceive her as a "threat" or as one "subjecting" her to "physical contact." *See* N.Y. Penal Law §§ 240.20(1), (6); 240.26(1). Moreover, though Mesa states that she was peacefully leaving the celebration, the verbal and physical altercation with Dolan could have led a reasonable officer to objectively believe that Mesa was indeed "congregating with others" and "refusing to comply with a lawful order to

22

disperse." In examining arguable probable cause, a court must look to the information at the officers' disposal at the time of the incident. Here, given the hour, the number of persons in the crowd, and the undisputed events that transpired, a reasonable officer certainly could have concluded that probable cause existed. *See Ricciuti*, 124 F.3d at 128 ("A police officer is entitled to qualified immunity shielding him or her from a claim for damages for false arrest where (1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest.").

### Mesa's State Claims

New York Law does afford a defense of qualified immunity for government officials to state law claims such as those for false arrest and imprisonment wherever the official's action is not taken in bad faith or without a reasonable basis. *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004). This reasonableness standard is the same standard as that applied in federal qualified immunity analysis; thus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law. *See Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006). Thus, given the presence of arguable probable cause for Mesa's arrest, and the objective reasonableness of the officers' actions, Defendants are accordingly immune from Mesa's state law claims as well.

### Flores' Federal Claims

In contrast, Flores' false arrest and imprisonment claims against Dolan must survive summary judgment, because Dolan does not have qualified immunity with respect to these allegations, and because there is a genuine issue of fact with respect to probable cause. Likewise, the claims against Delvalle survive summary judgment, under the theory of failure to intervene,

as she was clearly at the scene and did transport Flores to the police station. (Delvalle Dep., at 84:7-85:6.) *Cf. Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise."). Flores undisputedly took a flash photograph of Dolan while she was attempting to disperse the crowd. According to Flores, in the moments after the photograph, Defendants pursued his group, yelling that it was "illegal to photograph Police," and subsequently arrested him. (Flores Dep., at 119:24-123:1.) As a result of this conduct during the celebration's dispersal, Flores was arrested and issued a summons for disorderly conduct. *See* N.Y. Penal Law § 240.20(6) ("A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse."). Flores was found not guilty of this charge in a later criminal disposition. (Chen Decl., Exhibit R.) Thus, the individual officers' immunity again will depend on the objective reasonableness of their perceptions and actions in light of the information at hand during the night in question. Whether a police officer has probable cause to arrest individuals for refusing a lawful order to disperse depends on two factors: (1) the extent to which police communicated the orders to the crowd; and (2) whether individuals had an opportunity to comply with the orders. *See Dinler v. New York*, No. 04 Civ. 7921, 2012 WL 4513352, at *10 (S.D.N.Y. Sept. 30, 2012) (discussing disorderly conduct under New York law) (citing *People v. Carcel*, 3 N.Y.2d 327, 333 (N.Y. Ct. App. 1957)); *Carcel*, 3 N.Y.2d at 333 (N.Y. Ct. App. 1957) ("It is clear that the gravamen of the offense . . . is not so much the conduct of the defendant as it is the refusal to desist from that conduct after being ordered to by the police. Thus where a member of

24

the Bar stood quietly conversing with a group of friends on a city street and refused to accede to a policeman's request to move on, it was held that the refusal constituted disorderly conduct . . . , although the act of the defendant, in the absence of a policeman's order, would undoubtedly not have warranted a conviction . . . .").

Here, according to Flores' narrative, he was dispersing after the incident with the camera, and it was the police that subsequently pursued and arrested him, despite his compliance. On these facts, it cannot be concluded beyond genuine dispute that qualified immunity applies, and the fact that the officer would have had probable cause under her own version of the facts is irrelevant for the purposes of summary judgment. *See Travis v. Dobbs Ferry*, 355 F. Supp. 2d 740, 753-54 (S.D.N.Y. 2005) ("If the facts are as alleged by plaintiff (which I must assume in deciding a motion for qualified immunity), then no reasonable officer in [Defendant's] position could have believed that he was authorized to stop plaintiff. If, however, the facts are as [Defendant] asserts, he had a reason to stop plaintiff. This matter will have to abide a trial."). Flores clearly knew that he had to leave (Flores Dep., 92:4-9), and thus he was aware of the officers' orders, and according to him, he followed them. The mere taking of a photograph from ten feet away,[11] during the peaceable act of dispersal, does not constitute a refusal to comply with a "lawful order to disperse." If the police truly pursued him as he calmly left the event, and then arrested him for no apparent reason, then Flores is correct that there is not even arguable probable cause for the summons. In contrast, if the events are as Defendants contend—meaning that Flores was inches from Dolan's face and refused to disperse—then it is clear that reasonable officers could believe that it was appropriate to arrest Plaintiff.

---

[11] The parties dispute the distance from which Flores took the photograph. *See supra* Section I.A, at 4.

Despite this stark difference in narratives between Flores and Dolan, the fact remains that under Flores' alleged facts, arguable probable cause simply does not exist, as no reasonable officer could view Flores' conduct as disorderly. Thus, Flores' § 1983 false arrest and imprisonment claims against Dolan survive summary judgment. *See, e.g.*, *McCart v. Vill. of Mount Morris*, No. 09 Civ. 6472, 2011 WL 3421505, at *9 (W.D.N.Y. Aug. 4, 2011) ("Crediting Plaintiff's version of the facts and taking all reasonable inferences in his favor, this Court cannot say that no rational jury could find that it was objectively unreasonable [for the Officer to arrest Plaintiff]. Accordingly, because there is a material issue of fact with respect to this element of the charge of disorderly conduct, this Court finds that it is premature to determine whether [Defendant] in entitled to qualified immunity on the false arrest and malicious prosecution claims."). *See also Weyant*, 101 F.3d at 855 (noting that summary judgment is inappropriate where there is a "sharp dispute as to the nature of [a material party's] conduct").

### Flores' State Law Claims

New York law "grant[s] government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis." *Jones*, 465 F.3d at 63 (2d Cir. 2006) (citing *Blouin*, 356 F.3d at 364 ("The New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis.")). An analysis of state law claims thus "depend[s] on the same reasonableness standard at issue with respect to Plaintiffs' federal claims." *Id.* at 64 (internal quotations omitted). Thus, as this Court has concluded there is a genuine issue of material fact as to the reasonableness of Dolan and Delvalle's actions towards Flores, his state law claims also survive summary judgment, and the officers are not entitled to qualified immunity on Flores' state law allegations.

26

### 2. Malicious Prosecution

Flores and Mesa assert malicious prosecution claims under both § 1983 and its state law analog.[12] Again, the officers assert qualified immunity as a defense to the federal claims. "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment," along with all the elements of malicious prosecution under state law. *Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). Under New York law, a claim for malicious prosecutions requires: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." *Savino*, 331 F.3d at 72 (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 82 (N.Y. Ct. App. 1983) (internal quotations omitted)).  A plaintiff alleging malicious prosecution has the burden of proving all four of these elements, and the failure of one element effectively destroys the claim.

In order to state a claim for malicious prosecution under § 1983, a plaintiff *must* also allege a constitutional violation. *Singer*, 63 F.3d at 116. As the Second Circuit has noted, "[a] plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.'" *Id.* Without such an assertion, there is "no harm of constitutional proportions—*i.e.,* a harm cognizable under § 1983." *Id.* Moreover, this seizure must be effectuated pursuant to "legal process." *Heck v. Humphrey*, 512 U.S. 477, 484 (1994). "According to the Court of Appeals, a seizure pursuant to legal process will either be in the form of a warrant and accompanying arrest or 'a subsequent

---

[12] As damages from a malicious prosecution claim begin from the arraignment or issuance of a summons, Plaintiffs do not state a proper claim as to officer Delvalle, because she did not process the arrests or initiate the proceedings against Plaintiffs. Plaintiffs allege no facts suggesting that she was aware of the processing for particular charges and the initiation of proceedings. Thus, even if there were a violation on this front, she would have had no opportunity or reason to know of it. (Delvalle Dep., at 84:10-20.)

arraignment, in which any post-arraignment deprivations of liberty might satisfy this constitutional requirement.'" *Porat v. Lincoln Towers Community Assoc.*, No. 04 Civ. 3199, 2005 WL 646093, at *2 (S.D.N.Y. Mar. 25, 2005) (quoting *Singer*, 63 F.3d at 117)).

### Mesa's State and Federal Claims

With respect to Mesa's C summons, a warrantless summons, coupled with a court appearance, is generally insufficient to give rise to a malicious prosecution claim—under both § 1983 and state law. *See, e.g.*, *Garrett v. Port Authority of New York & New Jersey*, No. 04 Civ. 7368, 2006 WL 2266298, at *7 (S.D.N.Y. Aug. 8, 2006) ("Absent the initiation of proceedings, a court appearance pursuant to the summons alone cannot give rise to a malicious prosecution claim."). *But see Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (holding that "the requirements of attending criminal proceedings and obeying the conditions of bail suffice" as sufficient liberty deprivations). It also appears that Mesa has abandoned her malicious prosecution claim associated with this summons, as "precluded by her ACD at trial." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 52, at 14.) Moreover, regarding the misdemeanor arrest, Mesa was released from custody *after* her arraignment. (*Id.* at 5.)

Regarding her misdemeanor *arrest*, the fact that Mesa was detained before, not after, her arraignment is relevant to her claim for false arrest, but not to her claim for malicious prosecution, and there is no evidence in the record that she was detained during the legal proceedings for her misdemeanor. Thus, Mesa's misdemeanor arrest "cannot serve as the predicate deprivation of liberty," as it "occurred prior to [her] arraignment and without a warrant," and therefore was not "pursuant to legal process." *Grant v. City of New York*, 500 F. Supp. 2d 211, 216 (S.D.N.Y. 2007) (quotations and citation omitted); *see also Porat*, 2005 WL

28

646093, at *2. It is true that post-arraignment deprivations of liberty may constitute a "seizure," giving rise to a constitutional violation, and Mesa undeniably appeared in court as a result of her misdemeanor arrest. However, a long line of cases has held that a single court appearance "as an alleged deprivation of liberty, is insufficient to support a Section 1983 malicious prosecution claim." *Porat*, 2005 WL 646093, at *3. Accordingly, summary judgment in favor of Defendants on Mesa's § 1983 malicious prosecution claims is appropriate.

The analysis of Mesa's state law malicious prosecution claim, with respect to her misdemeanor arrest, requires separate examination, as there was indeed favorable termination regarding those particular charges. On November 30, 2009, Judge Davidowitz found Mesa not guilty of her arrest charges (Dkt. No. 51, at ¶ 46), which, as a matter of law, constitutes a favorable determination, meaning that Mesa has met two elements of her malicious prosecution claim stemming from the misdemeanor arrest, namely: (1) the initiation of a proceeding by Dolan; and (2) favorable termination. However, to prevail, she must also show (3) the lack of probable cause (or arguable probable cause when it comes to Dolan's qualified immunity for the claim); and (4) malice. In this context, probable cause refers to "such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty." *Colon*, 60 N.Y.2d at 82. Under New York law, "[a] party may act with probable cause even though mistaken," so long as that party "acted reasonably under the circumstances in good faith." *Id.*

As discussed above, Dolan possessed arguable probable cause under two separate theories for the misdemeanor arrest: (1) Judge Quattrochi's prior finding of Mesa's guilt for disorderly conduct; and (2) the independent reasonableness of Dolan's actions. Moreover, as for malice, Dolan explained in her deposition the reasoning behind the separate misdemeanor processing for harassment, resisting arrest, and disorderly conduct, stating that the

"circumstances changed" after Mesa made physical contact with her. (Dolan Dep., 112:14.) Whereas the disorderly conduct C Summons only referenced Mesa's alleged refusal to disperse, the misdemeanor arrest stemmed from the physical contact. (*Id.*) The Court takes as true Mesa's contention that she inadvertently made physical contact with Dolan—in her own words, she "lunged" into the officer after she lost her balance (Mesa Dep., 103:6-24). From the reasonable officer's perspective, as discussed *supra*, there was, at minimum, arguable probable cause to arrest and process Mesa for a misdemeanor that included, *inter alia*, a charge that she had "subjected" an individual to "physical contact," as described in N.Y. Penal Law. Moreover, while Plaintiff's facts are taken as true, that she did not in fact hit or purposefully come into contact with Dolan, Delvalle stated in her deposition that she indeed perceived forcible contact, initiated by Mesa, between Mesa and Dolan. While not taken for its truth, that statement does serve as record evidence of one officer's perception of the events—a perception that corroborates Dolan's statement that the physical contact altered circumstances such that she found it appropriate to process Mesa for additional charges. Thus, with respect to Mesa's misdemeanor arrest and charges, Dolan is entitled to qualified immunity under the "reasonableness standard" applied to qualified immunity for state law claims. *Jones*, 465 F.3d at 64. And while the probable cause present for an arrest may "dissipate" later, with the "groundless nature of the charges" coming to light, here, there is no evidence of such an occurrence. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996).

### Flores' State and Federal Claims

Flores' malicious prosecution claims also fail because a warrantless summons, demanding only a court appearance, cannot provide the basis for a malicious prosecution claim, under either § 1983 or state law. *See Puckowitz v. City of New York*, No. 09 Civ. 6035, 2010 WL

3632692, at *5 (S.D.N.Y. Sept. 17, 2010) ("Here, [Plaintiff] was issued a desk appearance ticket and [Defendant] signed a criminal complaint against him, which ultimately required [Plaintiff] to appear in court. . . . Absent [a neutral] evaluation, the initial steps taken by the New York City Police Department to bring charges against [Defendant]—the issuance of the desk appearance ticket and the signing of the criminal complaint—do not constitute the initiation of criminal proceedings and cannot form the basis of a claim for malicious prosecution."); *Katzev v. Newman,* No. 96 Civ. 9138, 2000 WL 23229, at *4 (S.D.N.Y. Jan. 12, 2000) ("[A] charge and a warrantless arrest—concluding with the issuance of the desk appearance ticket—may be a sufficient deprivation of liberty to support a claim for false arrest, but do not amount to a prosecution and cannot alone support a claim for malicious prosecution, which typically implicates a post-arraignment deprivation of liberty or at least an arrest pursuant to a warrant." (internal citation omitted)).

While Flores' time in handcuffs on the night in question was undeniably a seizure under the Fourth Amendment, this occurrence is only relevant to his claim of false arrest, not to his claim of malicious prosecution. *See Katzev*, 2000 WL 23229 at *5 ("Plaintiff was not arrested pursuant to a warrant, plaintiff was not arraigned, and there was no post-arraignment deprivation of liberty."). Therefore, summary judgment for Defendants on the merits of Flores' malicious prosecution claims—both federal and state—is appropriate.

### 3. Excessive Force

Mesa and Flores also bring § 1983 claims for excessive force; Mesa further alleges related assault and battery claims under state law.[13] The officers assert qualified immunity as a

---

[13] Mesa's assault and battery claims are discussed *infra* in § III.B.7.

defense to the federal claims. It is well established that qualified immunity may operate as a defense to excessive force claims. *Finnegan v. Fountain*, 915 F.2d 817, 822-23 (2d Cir. 1987). While it is "beyond dispute that the right to be free from excessive force has long been clearly established," *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000), the standard that governs law enforcement's actions in the excessive force context is anchored in the Fourth Amendment's "reasonableness" paradigm, which categorically protects citizens from the use of unreasonable force by a police officer in the course of effectuating an arrest. *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). As the Fourth Amendment's reasonableness standard is an objective one, in determining the validity of an excessive force claim, courts must balance "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* To aid in this balancing, courts examine three, primary factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Graham*, 490 U.S. at 396).

Again, on a motion for summary judgment, the facts must be viewed in the light most favorable to the non-movant. Nonetheless, the record must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (quoting *Graham*, 490 U.S. at 396) (internal citation and quotations omitted). Even a valid arrest, made with probable cause, may lead to an excessive force finding where officers act unreasonably in physically restraining a suspect. However, it is equally well established that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). At

bottom, the excessive force inquiry is fact-specific, requiring courts to determine "whether the totality of the circumstances justifie[d] a particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985).

The right to effectuate an arrest does include "the right to use some degree of physical coercion." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005). Reasonable arrests tend to involve handcuffing the suspect, and handcuffs lose their effectiveness if they are not attached tightly enough to "prevent the arrestee's hands from slipping out." *Id.* Moreover, while a sustained injury that requires doctors' visits is not a necessary element of a successful excessive force claim, *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987), where a plaintiff suffers from *de minimis* injury, it is more difficult to establish that the force used was excessive in nature. *Cf. Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) ("[T]he extent and nature of the injury, if any, is typically relevant in an arrest context . . . because it is probative of the amount and type of force actually used by the arresting officers, and that in turn is likely to reflect on the reasonableness of that force, though reasonableness of course turns as well on the circumstances of the arrest, including—most notably—whether and to what extent the arrestee offered any resistance."). Of course, even if there is an issue of material fact as to the force employed, summary judgment may still be appropriate on qualified immunity grounds, so long as the officers acted in an objectively reasonable manner, given the information available to them at the time they employed the force. *See Landy v. Irizarry*, 884 F. Supp. 788, 798 (S.D.N.Y. 1995) ("Nevertheless, summary judgment in an excessive force case is not precluded if the evidence, viewed in a light most favorable to the plaintiff, would support a directed verdict for the defendants, i.e., '[i]f reasonable minds could [not] differ as to the import

of the evidence" and 'there can be but one reasonable conclusion as to the verdict.'" (quoting *Anderson*, 477 U.S. at 250)).

Plaintiffs also allege a failure to intervene associated with their excessive force claims, presumably as a theory of liability against Dolan, as she is not alleged to have physically restrained Mesa or Flores during their respective arrests (*see* Mesa Dep., at 104:12-107:25; Flores Dep., at 131:19-25), and for Delvalle with respect to Flores' arrest, as she handcuffed Mesa, but not Flores. (Delvalle Dep., at 74:11-75:24.) It is axiomatic that law enforcement officials have an "affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson*, 17 F.3d at 557. Specifically, "[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (internal citations omitted). However, even where these criteria are met, liability will attach only if an officer had a "realistic opportunity" to prevent the harm. *Id.*

### *Mesa's Excessive Force Claim*

According to Mesa's account of her arrest, after she was pushed into Dolan, several officers, including Delvalle, jumped onto her, forced her to the sidewalk, and "eventually lifted her up to handcuff her, and push her against a brick wall." (Dkt. No. 51, at ¶ 18.) As a result, she suffered two bruises on her arms. (*Id.* at ¶ 20.) Flores testified in his deposition that Mesa did not resist and "couldn't do anything but . . . get pushed around." (Flores Dep. 127:19-23, 128:12-13.) Mesa did not identify the officers who allegedly jumped on top of her after the physical contact with Dolan. (Mesa Dep., 104:12-17.) She claims that several officers forced her into a fetal

position in an attempt to handcuff her, but notes that none of them was officer Dolan or Delvalle. The question is whether this conduct was reasonable on the part of the officers involved (here, Dolan and Delvalle), based on Mesa's contention that she was not resisting arrest.

While the conflict in narratives regarding Mesa's arrest makes summary judgment on the merits of the excessive force claim inappropriate, both Dolan and Delvalle are entitled to qualified immunity, as their actions were objectively reasonable. As discussed *supra*, a police officer's actions are considered objectively unreasonable "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon*, 66 F.3d at 420-21. Accordingly, wherever a court "determines that the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Id.* at 421. Here, the undisputed facts dictate a conclusion that reasonable officers could find the use of force necessary under these circumstances, as approximately five officers did find here. While the number of officers involved in the altercation does not convert otherwise unconstitutional conduct into permissible action by sheer force of numbers, it is a relevant fact that several officers, including Delvalle, came to Dolan's aid after she stated that she had been assaulted. (Delvalle Dep., at 72:8-73:12.) It makes no difference that Mesa did not, in actuality, hit Dolan, so long as it was reasonable for the officers who detained her to perceive that some sort of forcible contact had occurred between the two. Delvalle testified that she witnessed what she perceived to be a "punch," and even under Plaintiff's version of the facts, such a perception was objectively reasonable in light of the contact made between Mesa and Dolan and Dolan's reaction to the incident (her statement that she had been "hit"). (Dolan Dep., at 91: 9-11.) Many of the contradictory facts described in the parties' respective narratives, such as whether Dolan

35

indeed asked Mesa for her identification before the physical contact between the two occurred, are immaterial to the reasonableness of the force employed, as the officers on the scene perceived the contact and responded accordingly.

While Mesa states that she was pushed to the ground by unnamed police and handcuffed roughly against a brick wall, she alleges no facts suggesting that the officers observing this action—Dolan and Delvalle—could have known that she was not resisting at all, and thus did not require such restraint. In her own words, Mesa was "covered in blue" (Mesa Dep., at 104:24), and other eyewitnesses also describe a flurry of activity. (Eversley Dep., at 71:7.) While Flores states that Mesa could not resist, given the number of officers effectuating the arrest, to implicate Dolan and Delvalle as bystanders who failed to intervene, there must be some evidence that an objectively reasonable officer in their position would have perceived a constitutional violation. Given the undisputed fact that Mesa made "lunge"-type contact with Dolan, it was objectively reasonable for officers to believe that the suspect required some degree of restraint or incapacitation, even if she actually did not. In fact, both Mesa and Dolan reported in their depositions that officers at the scene yelled out, albeit not in a polite manner, that it was impermissible to hit a police officer (Dolan Dep., at 91:24-92:2; Mesa Dep., at 104:19-21), suggesting that one viewing this incident could reasonably be mistaken as to the forcible nature of Mesa's conduct.

It is true that bruises or even fleeting pain, such as that which Mesa claims she experienced during her arrest, *may* give rise to an excessive force claim. However, courts are understandably reluctant to recognize a constitutional violation when an injury is *de minimis*, and an officer's involvement is limited. *Compare Robison*, 821 F.2d at 916-18 (holding that Plaintiff's assertions that Defendant "pushed," "yanked," and "threw" her, and also "twisted" her

36

arm behind her back, causing bruising, were sufficient to prevent summary judgment dismissal of a § 1983 claim for excessive force), *with Rincon v. City of New York*, No. 03 Civ. 8276, 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) ("Aside from the swelling in her wrist, Plaintiff does not allege that Defendants caused any other injuries. Plaintiff's allegations are *de minimus* and simply do not amount to a constitutional violation.").

Here, Mesa does not allege that either Delvalle or Dolan pushed her down or forced her into a fetal position, though Delvalle, as discussed, stated that she did attempt to put handcuffs on Mesa before the other officers became involved. Though Mesa claims that she did not resist and was manhandled by the police, her excessive force claims against Dolan and Delvalle derive from their failure to intervene as the other officers' performed these allegedly unconstitutional acts. While it is clear from Dolan's and Delvalle's depositions that they *perceived* Mesa to be resisting (Dolan Dep., 98:17-19; Delvalle Dep., 72:18-73:12), their subjective intent is not determinative. However, an analysis of the aforementioned *Graham* factors reveals that this perception was objectively reasonable. While Mesa was unarmed and a single woman, assaulting a police officer is a serious offense, and the officers therefore could reasonably believe that the "nature and severity" of the alleged crime "posed an immediate threat to the safety of the officer," in this case, Dolan, "or others." *See, e.g.*, N.Y. Penal Law § 120.05 (defining assault in the second degree—a class D felony—as, *inter alia*, when an individual "causes physical injury" to a police officer with "intent to prevent" them from "performing a lawful duty"). "Resistance to arrest 'does not give the officer license to use force without limit' in response." *Tracy*, 623 F.3d at 99. However, none of the actions of the officers restraining Mesa would have appeared grossly disproportionate to a reasonable officer's expectations in dealing with a potentially violent suspect. *See Landy*, 884 F. Supp. at 799 (holding that summary judgment in favor of officer was

appropriate on excessive force claim, where arrestee had resisted handcuffing and officer had allegedly kicked and "stuck" him, while "jam[ming]" a gun against his head, causing him to bleed). While Mesa's account of the events certainly highlights the regrettable consequences of a misunderstanding between the police and Plaintiffs during a hectic dispersal situation, nothing in Plaintiffs' narratives suggests that the officers' actions were flagrantly "injurious, malicious, or excessive," *Robison*, 821 F.2d at 923, such that they demanded immediate intervention. Moreover, again, the fact that many officers undisputedly came to Dolan's aid after she, in Mesa's words, "cried assault" (Mesa Dep., at 104:12), suggests, albeit circumstantially, that reasonable officers could indeed believe the situation required some application of force. *Cf. Tracy*, 623 F.3d at 97 ("From [the Officer's] perspective, a suspect he strongly—and correctly—presumed to be a fugitive from the law, made a quick and sudden movement as [he] attempted to effect an arrest without the assistance of other officers. His decision to use his flashlight to protect himself and subdue an arrestee he perceived to be actively resisting was therefore a reasonable response."); *Kent v. Katz*, 125 Fed. App'x. 334, 335 (2d Cir. 2005) ("[Plaintiff] . . . claims that the jury's verdicts on excessive force and qualified immunity were legally inconsistent because the jury found that defendant had acted unreasonably in using excessive force, but that defendant had reasonably believed his conduct to be lawful. The Supreme Court has made it clear, however, that these are separate questions to which differing answers can be given.").

### Flores' Excessive Force Claim

Flores also asserts excessive force claims, presumably on the theory of failure to intervene, against Dolan and Delvalle. While summary judgment in favor of Defendants is not

warranted on Flores' false arrest and imprisonment claims, his excessive force claim nevertheless cannot survive summary judgment.

In *Atkins v. New York City*, 143 F.3d 100 (2d Cir. 2005), the Second Circuit held that where a plaintiff's injuries are undisputedly caused by excessive force, a jury must award some compensatory damages. *See id.* at 103 ("[I]f the jury believed Atkins started to swing at Justice (for which he was arrested), the force used in connection with the arrest was unlawful because the arrest was found to be unlawful." ). This decision engendered some confusion among district courts, which interpreted *Atkins* to mean that "any force used in connection with an arrest that lacked probable cause is by definition excessive." *See Jones*, 465 F.3d at 51 (discussing *Jones v. McMahon*, No. 5:98 Civ. 374, 2005 WL 928667 (N.D.N.Y. Mar. 28, 2005)). In *Jones*, the Second Circuit made clear that it had never intended to "substitute a new standard for arrests lacking probable cause," noting that *Graham*'s reasonableness test "remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Jones*, 465 F.3d at 62. Thus, the mere fact that the officers may not have had probable cause for Flores' arrest and detention does not necessitate a ruling for Plaintiff on the excessive force claim.

Flores claims that after he took the Dolan photograph, unknown officers "grabbed" his wrist and his back, and "put [him] up on the glass." (Flores Dep., at 122:9-11.) Flores alleges that he was pushed into the glass "forcefully" by an officer, "as if he was trying to throw [Flores] through the glass." (*Id.* at 122:20-23.) However, Flores alleges no pain or physical injuries as a result of this encounter. (Dkt. No. 51, at ¶ 26.) Moreover, Flores stated in his deposition that he asked the officer restraining him to stop, once the glass started shaking, and the officer complied. (Flores Dep., at 122:20-123:1.) As discussed *supra*, there is generally some degree of force

involved in the arrest of even a peaceful, non-resisting arrestee, as the act of putting handcuffs on a suspect is not, by its nature a completely forceless one.

While perhaps, given Flores' narrative, detaining Flores up against a wall was unnecessary, it was not per se excessive, especially upon reflection of the fact that the officer immediately ceased any offending behavior once Flores made his discomfort known. Nothing in the record suggests that Flores was subjected to an unreasonable amount of force; in fact, if anything, the officers involved seemed to use force proportionate to that necessary in arresting a young, adult male. *Esmont*, 371 F. Supp. 2d at 214-15 ("The reasonableness of the handcuffing of an arrestee must be determined in light of the minimal amount of force necessary to maintain custody . . . ."); *see also Lennon*, 66 F.3d at 426 (finding that qualified immunity on excessive force grounds was appropriate against female Plaintiff who had sought hospital treatment for injuries to wrist and arm after an officer "forcibly yanked" her from her vehicle after she refused to move).

Moreover, at least with regard to handcuffs, courts have held that where officers promptly respond to an arrestee's expressions of discomfort, a plaintiff's case against qualified immunity is properly more difficult. *See Esmont*, 371 F. Supp. 2d at 215 ("[Plaintiff] has failed to present evidence that she requested that her handcuffs be loosened. There is therefore no evidence that any defendant unreasonably ignored her complaints of pain. Neither [Plaintiff] nor the Court's research reveals any cases permitting a plaintiff to establish an excessive force claim based on tight handcuffing in the absence of a request to loosen them." (internal footnote omitted) (citing *Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002) (granting summary judgment for police officer, as Plaintiff had not requested loosening))); *Johari v. Columbus Police Dep't*, 186 F. Supp. 2d 821, 829 (S.D. Ohio 2002) (granting summary judgment for police

officer where officer had no knowledge of the discomfort). This Court does not suggest that an arrestee subjected to unconstitutional force must announce his discomfort to the offending officers or risk losing his claim, but rather that the ordinary activities associated with an arrest—such as handcuffing—are less likely to give rise to an excessive force violation where the average officer had no reason to know that routine detainment would cause pain or discomfort to the arrestee.

Moreover, the photographs of Flores with his hands against the glass do not depict an officer pushing or shoving Plaintiff forcefully into the glass. Rather, in one photograph Plaintiff has his hands against the glass, and one can see an officer's hand on his shoulder, and in the other, several other officers in the vicinity, but not touching him. (*See* Chen Decl., Exhibits U & V.) While photographs by nature only depict a single moment in time, there is no evidence in the record, including Flores' testimony, to suggest that the officers exhibited unreasonable force, or even more than minimal force, in detaining him. Importantly, as there is no evidence that either Delvalle or Dolan detained Flores physically, their liability must derive from a lack of intervention. Given the fact that the arresting officers complied with Flores' request to cease when he expressed discomfort, and no other activity other than handcuffing is alleged, neither Dolan nor Delvalle would have had reason to objectively believe that Fourth Amendment rights were being violated during this encounter. Accordingly, this Court cannot say that no reasonable officer would have seen this arrest and failed to intervene. Thus, summary judgment on qualified immunity grounds is warranted as to Flores' excessive force claim. *See Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir. 2007) ("[A]n officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." (quoting *Malley,* 475 U.S. at 341)).

41

### 4.  First Amendment and Abuse of Process

Pursuant to § 1983, Plaintiffs also assert violations of their First Amendment rights to freedom of speech, association, religion, and assembly, along with a First Amendment retaliation claim related to the Flores photograph. (Compl., Dkt. No. 22, at ¶¶ 161-63, 189-99, 205-14.) Defendants again raise qualified immunity as a defense. (Dkt. No. 46, at 3-4.) First Amendment rights are central to our democracy.  *See, e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) (freedom of speech); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958) (freedom of association); *De Jonge v. Oregon*, 299 U.S. 353 (1937) (freedom of assembly). Here, however, there is no evidence in the record to suggest that, with respect to Plaintiffs, these rights were infringed. It is well established that municipalities may constitutionally regulate the time, place, and manner of expression in its public areas, provided that such regulation is content-neutral, serves an important governmental interest, and is narrowly tailored. *Ward v. Rock Against Racism,* 491 U.S. 781,791 (1989). Thus, the City was well within its rights to shut down the sidewalk celebration at a stated time.

Undisputedly, Plaintiffs attended an informal gathering in honor of St. Michael's Day. A community affairs official reached an informal agreement with the owner of the botanica, around which this gathering centered, that the event would end at 8:00 PM. The police were not shutting down peaceful protest or preventing Plaintiffs from practicing their religion; they were merely executing a lawful order to disperse. In fact, Plaintiffs do not dispute that everyone agreed that the event was to end at 8:00 PM, or that the celebration was unlicensed. (Dkt. No. 51 at ¶ 8.) Moreover, there is no evidence in the record that Hernandez, or the community affairs officers, targeted the gathering due to its religious affiliation. Instead, it seems abundantly clear from the record that the officers were simply there to disperse an unlicensed celebration of several

42

hundred individuals. Thus, for qualified immunity purposes, the officers were not invading

Plaintiffs' clearly established rights of association, assembly, and free exercise, as they were

executing a lawful order to disperse—a permissible time, place, and manner restriction on speech

in a public area. *See Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) ("[W]e 'determine

first whether the plaintiff has alleged a deprivation of a constitutional right at all.'" (quoting *Cty.*

*of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998))).

However, the substance of Plaintiffs' First Amendment claim seems to stem primarily not

from the act of dispersal, but rather from the officers' alleged retaliation against Plaintiffs for the

taking of the photograph. To succeed on a First Amendment retaliation claim, a party must show:

"(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated

or substantially caused by his exercise of that right; and (3) defendants' actions effectively

chilled the exercise of his First Amendment right." *Curley v. Suffern*, 268 F.3d 65, 73 (2d Cir.

2001). Whether there is a First Amendment right to photograph police is a question of law for

this Court, which affects the analysis of the officers' liability, as the clarity of the First

Amendment right in question is possibly determinative of Defendants' immunity.

With respect to Mesa's retaliation claims, summary judgment is appropriate because the

officers had probable cause for the disorderly conduct arrest. *Id.* ("[B]ecause defendants had

probable cause to arrest plaintiff, an inquiry into the underlying motive for the arrest need not be

undertaken."). However, Flores' First Amendment retaliation claim requires more attention, as

the Court has determined that there is a genuine issue of material fact with respect to the

existence of probable cause for his arrest.

While freedom of speech and expression are clearly established constitutional freedoms,

the right of the public to photograph police officers in the performance of their official duties,

43

and the scope of that right, are less clear. *See, e.g.*, *Kelly v. Borough of Carlisle,* 622 F.3d 248, 262 (3d Cir.2010) ("We have not addressed directly the right to videotape police officers."). The First Amendment, while "valued as essential to the preservation of a political democracy in this country," protects far more than core political speech. *See Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996) (noting that the First Amendment protects film, theater, music, marches, sit-ins, and parades, and holding that visual artists are entitled to First Amendment protection for the sale of their work in public areas). Thus, so long as art can be said to have a communicative aspect, it is "well-protected by the First Amendment." *Porat*, 2005 WL 646093, at *4.

Flores was engaged in communicative activity when taking the photograph of Dolan, as he stated several times in his deposition that he was attempting to document police misconduct. (Flores Dep., at 95:13-96:2, 107:2-109:14.) Moreover, Flores has been extensively involved with photographing and videotaping police, sharing his work in public forums. (*Id.* at 104:1-106:25.) However, the First Amendment implications of photographing police officers under the circumstances presented here are less than clear.

It is true that several courts of appeals, most recently the First Circuit, have indeed held there to be such a right. *See Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2012) ("The filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within [First Amendment] principles. Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" (citation omitted)); *Am. Civ. Liberties Union v. Alvarez*, 679 F.3d 583, 600 (7th Cir. 2012) ("In short, the eavesdropping statute restricts a medium of expression—the use of a common instrument of communication—and thus an integral step in the

44

speech process. As applied here, it interferes with the gathering and dissemination of information about government officials performing their duties in public. Any way you look at it, the eavesdropping statute burdens speech and press rights and is subject to heightened First Amendment scrutiny."); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing a First Amendment right to photograph police activity, subject to reasonable time, place, and manner restrictions); *Fordyce v. Seattle*, 55 F.3d 436, 439-40 (9th Cir. 1995) (upholding a "First Amendment right to film matters of public interest"). However, other circuits have decided just the opposite, declining to extend First Amendment protections to the recording of police activity. *See Kelly*, 622 F.3d at 262-63 (holding that the First Amendment right to record matters of public concern is far from absolute, and does not clearly establish the right to videotape police officers during a traffic stop); *Szymecki, v. Houck*, 353 Fed. App'x. 852, 853 (4th Cir. 2009) ("Here, the district court concluded that Szymecki's asserted First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct. We have thoroughly reviewed the record and the relevant legal authorities and we agree.").

Though this Court is inclined to agree with the First, Seventh, Eleventh, and Ninth Circuits that the photography and recording of police officers engaged in their official duties "fits comfortably" within First Amendment principles, Defendants here are nevertheless entitled to summary judgment on Flores' First Amendment claim, as the right to photograph and record police is not clearly established as a matter of constitutional law in this Circuit.[14] While district

---

[14] While the NYPD did issue a directive in 2009 reminding officers that photography and recordation are generally not, in and of themselves, illegal activities, *see* N.Y.P.D. Operations Order No. 14, Investigation of Individuals Engaged in Suspicious Photography and Video

court decisions in this Circuit have dealt with similar cases involving both recordation and disorderly conduct prosecution, *see, e.g.*, *Bryant v. Crowe*, 697 F. Supp. 2d 482 (S.D.N.Y. 2010), no Second Circuit case has directly addressed the constitutionality of the recording of officers engaged in official conduct. Even if Dolan and Delvalle pursued Flores due to his photography, it is not clear whether Flores had an interest protected by the First Amendment, as required by a First Amendment retaliation claim. Therefore, summary judgment on qualified immunity grounds is warranted with respect to this claim.

### 5. Equal Protection

Plaintiffs also assert Equal Protection violations pursuant to § 1983. While Plaintiffs do not claim membership in a protected class, they do allege that they were "intentionally, arbitrarily and irrationally treated differently than the other attendees of the street festival." (Dkt. No. 52, at 21.) Again, Plaintiffs' allegation stems from the photography; that is, they claim that they were "treated differently than the other attendees of the . . . celebration because they engaged in First Amendment protected activity." *Id.* These allegations seem to arise from either a selective enforcement baseline or a "class of one" rationale. (*Id.*)

"[T]o prevail on a selective enforcement claim," a plaintiff must make a showing that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Women's Interart Ctr., Inc. v. New York City Economic Development Corp.*, No. 03 Civ. 2732, 2005 WL 1241919, at *25 (S.D.N.Y. May 23, 2005) (citations and internal quotations

---

Surveillance (04/03/09), such internal policy does not independently address the constitutionality of the recording of official police activity.

omitted). In contrast, a "class of one" claim hinges on a "plaintiff's ability to prove not that he or she was mistreated for an impermissible reason, but merely that the defendant's reason for treating him or her differently was wholly arbitrary or irrational, regardless of defendant's subjective motivation for doing so." *Id.*

Here, both Mesa's and Flores' Equal Protection claims must fail as a matter of law. First, as to Mesa, her disorderly conduct ACD, which settles the issue of probable cause for her initial disorderly conduct arrest, detainment, and summons, precludes selective enforcement and class of one claims. As soon as she got into a physical altercation with the police officer—inadvertent or not—Mesa was no longer similarly situated to all other revelers at the religious celebration. Indeed, such an altercation presents a non-arbitrary reason for treating Mesa differently from others attending the event.

Flores' claim rests on the alleged selective enforcement of the disorderly conduct statute based on his valid exercise of constitutional rights. As this Court has already determined that there was no clearly established First Amendment right to photograph police in the exercise of their duties, Flores' selective enforcement claim must fail on qualified immunity grounds. Similarly, assuming *arguendo* that Defendants arrested Flores solely due to his photography, such an arrest is neither arbitrary nor irrational, but rather a product of an application of constitutional law that has yet to be clearly established. Thus, this claim too fails on qualified immunity grounds.

### 6.  Abuse of Process

Both Flores and Mesa also assert abuse of process claims under New York state law and § 1983, presumably related to their First Amendment and Equal Protection claims. The right of all individuals to procedural due process "forbids the use of legal process for a wrongful

47

purpose." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Thus, a defendant may be liable under

both state law and § 1983 for the malicious abuse of criminal process if: "(1) [a defendant]

employs regularly issued legal process to compel performance or forbearance of some act (2)

with intent to do harm without excuse of justification, and (3) [does so] in order to obtain a

collateral objective that is outside the legitimate ends of the process." *Id.* The Second Circuit has

never squarely held that an abuse of process claim can arise solely from the issuance of process

itself, but rather has stated that the "gist of abuse of process is the improper use of process *after* it

is regularly issued." *Id.* at 80 (internal quotations omitted). Other courts in this district have also

so held. *See, e.g.*, *Richardson v. New York City Health & Hospitals Corp.*, No. 05 Civ. 6278,

2009 WL 804096, at *16 (S.D.N.Y. Mar. 25, 2009) ("The Court is bound by the law of the

Circuit, and persuaded by the . . . cases from this District. Accordingly, the *dicta* quoted by

Plaintiffs from *Parkin* [suggesting that process alone can give rise to an abuse of process claim]

does not alter the established law governing malicious abuse of process claims."); *Stewart v. City

of New York*, No. 06 Civ. 15490, 2008 WL 1699797, at *9 (S.D.N.Y. Apr. 9, 2008) ("[T]o

prevail on his malicious abuse of process claim, Stewart must establish that [Defendant] sought

to bring about a collateral objective separate and distinct from any malicious intent to initiate

proceedings against him. . . . Thus, the collateral objective must arise after process has issued."

(internal citations omitted)); *Morales v. United States*, 961 F. Supp. 633, 638 (S.D.N.Y. 1997)

("Thus, because plaintiffs have, at most, simply adduced evidence that the defendants had

potentially unlawful motives in initially arresting and criminally charging [Plaintiffs], and

nothing beyond, their claim must fail.").

      Here, Plaintiffs' abuse of process claim must fail as a matter of law. The only allegedly

improper motive they allege relates to Plaintiffs' First Amendment, or perhaps their Equal

Protection, claims. However, it is well established in this Circuit that malicious motive, without more, does not give rise to an abuse of process claim. Here, the "legal process" at issue constituted the Flores summons and the Mesa summons and arraignment. However, there is no evidence in the record to indicate that Defendants sought to abuse this legal process in order to achieve some other, nefarious end. Thus, even assuming that Defendants' motives for arresting and issuing the various legal instruments in this case were less than pure, there is simply no indication from the record that Defendants were engaged in post-process, collateral abuse of the legal system. Accordingly, summary judgment is granted in favor of Defendants on this claim.

### 7.  Emotional Distress and Mesa's Remaining State Law Claims

Along with alleging the aforementioned state law tort analogs of false arrest, imprisonment, and malicious prosecution, Mesa also asserts claims of assault, battery, and intentional and negligent infliction of emotional distress. Each claim is addressed briefly in turn.

Under New York Law, an assault is "an intentional placing of another person in fear of imminent harmful or offensive contact"; a battery is "intentional wrongful physical contact with another person without consent." *Lederman v. Adams*, 45 F. Supp.2d 259, 268 (S.D.N.Y. 1999) (quotations omitted). The New York Penal Law provides that an officer "may use physical force when and to the extent [she or] he reasonably believes such to be necessary to effect the arrest." N.Y. Penal Law § 35.30. Thus, "[w]here an arrest is supported by probable cause, an officer will not be liable under theories of assault and battery," so long as that force is reasonable. *Gomez v. City of New York*, No. 05 Civ. 2147, 2007 WL 5210469, at *11 (S.D.N.Y. May 28, 2007). Since "New York law regarding assault and battery generally parallels federal law regarding excessive force," *id.*, where the force employed by an officer is objectively reasonable, a claim for assault and battery against that same officer will not lie.  *Id.* Thus, as the force employed against Mesa

was objectively reasonable under the circumstances—giving rise to a finding of qualified

immunity—her assault and battery claims must fail as well.

Both Mesa and Flores also assert claims of emotional distress, which must fail as a matter of law.

Under New York Law, intentional infliction of emotional distress constitutes: (1) extreme and

outrageous conduct, coupled with (2) an intent to cause, or disregard of a substantial probability

of causing, severe emotional distress; (3) a causal relationship between the conduct and the

injury; and (4) severe emotional distress. *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121

(N.Y. Ct. App. 1993). Courts tend to focus on outrageousness as the *sine qua non* of an

emotional distress claim, as it is the "one most susceptible to determination as a matter of law."

*Id.* at 122. Intentional infliction of emotional distress does not proscribe particular conduct, but

instead "is as limitless as the human capacity for cruelty." *Id.*

Given that this Court has concluded that the officers' actions towards Mesa during the

festival dispersal were objectively reasonable, a finding of intentional or negligent infliction of

emotional distress will not lie. Intent aside—there must be some showing of "extreme and

outrageous conduct," meaning conduct outside "all possible bounds of decency," *Murphy v. Am.*

*Home Products Corp.*, 58 N.Y. 2d 293, 303 (N.Y. Ct. App. 1983). Here, the evidence shows that

the officers exercise objectively reasonable judgment in a difficult and confused situation; *a*

*fortiori* this conduct was not outrageous.  Given the lack of outrageousness, even a negligent

infliction claim of emotional distress will not lie.  *Sheila C. v. Povich*, 11 A.D. 3d 120, 130-31,

781 N.Y.S.2d 342 (1st Dep't 2004) ("Moreover, a cause of action for either intentional or

negligent infliction of emotional distress must be supported by allegations of conduct by the

defendants 'so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community.'" (internal quotations and citations omitted)).

Similarly, though there is a material issue of fact with respect to Flores' false arrest and

imprisonment claims, and as regrettable as the emotional side effects of Flores' interaction with

police may be, the police conduct on the night in question, even viewed in Flores' favor, simply

does not constitute behavior outside "all possible bounds of decency." *Murphy* , 58 N.Y. 2d at,

303 (N.Y. Ct. App. 1983). Accordingly, his emotional distress claims must fail as a matter of

law. No reasonable jury could conclude that Defendants' actions on the night in question were

"so outrageous in character, and so extreme in degree," to reflect behavior "utterly intolerable in

a civilized community." *Id.* Even under Flores' facts, he was arrested, briefly detained, issued a

summons, and then released. He does not allege that any officers struck him or even subjected

him to the slightest discomfort after he expressed his feelings regarding his stance against the

window. Moreover, even if Defendants did arrest Flores for the photograph and nothing more,

that act would reflect confusion over the scope of First Amendment protection, rather than an

intent to subject Plaintiff to fear and emotional distress. The rigor of the outrageousness standard

is well established, and here, Flores fails to meet it. *See, e.g.*, *Seltzer v. Bayer*, 272 A.D.2d 263,

265, 709 N.Y.S.2d 21 (1st Dep't 2000) (holding that the defendant's alleged dumping of a pile of

cement, tossing of lighted cigarettes, and drawing of a swastika on his neighbor's house did not

constitute conduct sufficiently outrageous to survive a motion for summary judgment); *Nader v.

General Motors Corp.*, 25 N.Y.2d 560, 569 (N.Y. Ct. App. 1970) (describing intentional

infliction of emotional distress as a "severe mental pain or anguish [that] is inflicted through a

deliberate and malicious campaign of harassment or intimidation").

### C.  The April 16, 2010 Precinct Incident

Defendants also move for summary judgment on all claims associated with the April 16, 2012 incident involving Flores, Kurti, Dolan, and Milligan, at the Precinct. With respect to these claims, Plaintiffs also cross-move for partial summary judgment. Because there are genuine issues of material fact within the two distinctive narratives offered by each party, this Court is not prepared to grant Plaintiffs' motion for summary judgment. As for Milligan and Dolan's (for purposes of this section, "Defendants") motion, this Court again examines the federal claims within the qualified immunity framework, as Defendants' motion raises qualified immunity as an affirmative defense.

#### 1.  False Arrest and False Imprisonment

Both Flores and Kurti assert claims of false arrest and imprisonment associated with their detainment at the Precinct during the afternoon of April 16. These claims are brought pursuant to § 1983 and under their state law tort analogs. There is no dispute that Flores and Kurti were arrested, detained, and issued summonses due to their conduct at the Precinct that day. (Defendants' Counter-Rule 56.1 Statement, Dkt. No. 62, at ¶¶ 23-26.) Therefore, absent probable cause, the elements of false arrest and imprisonment are clearly met. Defendants again assert qualified immunity as an affirmative defense to these claims. The question then becomes whether, under Plaintiffs' version of the facts, the officers objectively acted reasonably in detaining and issuing harassment summonses to Flores and Kurti.

According to Plaintiffs, Flores and Kurti were sitting calmly in the Precinct, when Milligan suddenly, and without provocation, arrested Flores, in retaliation for Kurti's failure to produce her identification. Later, for no reason other than her repeated, polite insistence that Milligan produce the "necessary paperwork" for the service log, Kurti too was arrested.

52

(Plaintiffs' Rule 56.1 Statement, Dkt. No. 56, at ¶¶ 19, 21.) Under Plaintiffs' version of the facts, Defendants lacked probable cause for detainment and issuance of a summons to Plaintiffs under N.Y. Penal Law § 240.26(3), which states that "[a] person is guilty of harassment in the second degree, when, with intent to harass, annoy or alarm another person[,] . . . [h]e or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose." *Id.* Plaintiffs' evidence suggests that Kurti did indeed have a legitimate purpose for her presence at the Precinct: to serve process pursuant to proper procedure. (Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment, Dkt. No. 57, at 11-12; Plaintiffs' Reply Memorandum of Law, Dkt. No. 63, at 3.) If one could be arrested for harassment due to one's mere presence inside the confines of a precinct, after being directed there by the police themselves, probable cause would become no more than pretext. Thus, under Plaintiffs' version of facts, not even arguable probable cause existed to arrest Kurti.

According to his version of facts, Flores too was arrested for no apparent reason, other than the fact that Defendants believed him to be filming inside the Precinct—an objectively unreasonable assumption, as no camera was visible. (Flores Dep., at 166:11-168:13.) Defendants have not shown that it would be objectively reasonable to arrest citizens for harassment under Plaintiffs' set of facts, pointing to no cases that find probable cause when individuals are complying with police orders and creating no disturbances regarding law enforcement. (*See, e.g.*, Dkt. No. 46, at 19-20.) Instead, Defendants simply emphasize their contradictory narrative, under which Dolan and Milligan *would* have had probable cause for a harassment arrest. (*See, e.g.,* Defendants' Opposition to Plaintiffs' Cross-Motion, Dkt. No 60, at 6.) Defendants' contentions highlight the genuine issues that necessitate a trial on these matters.

The Court recognizes that under Second Circuit case law, in order for an arrest to be privileged, an officer need not have probable cause for the particular charges eventually levied against an arrestee, but only a possible charge. *See Jaegly*, 439 F.3d at 154 ("[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the validity of the *arrest,* and not on the validity of each charge." (emphasis in original)). Thus, Defendants insist that Milligan and Dolan had probable cause for the Kurti arrest not only under N.Y. Penal Law § 240.26(3), but also under § 195.05, obstructing governmental administration (OGA). (Dkt. No. 60, at 6.)

While Defendants correctly state the law of probable cause, their argument fails in light of Plaintiffs' evidence. OGA refers to the "intentional[] obstruct[ion]" of governmental function by "means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05. However, under Plaintiffs' version of the facts, all Kurti did was fail to provide her identification and insist instead upon the named "necessary paperwork." Such activity does not constitute an independently unlawful act. Moreover, courts have interpreted the "physical" in the statute to modify *both* force *and* interference, whereas Kurti contends that her conduct was non-physical at all times. *See People v. Case*, 42 N.Y.2d 98, 102 (1977) (holding that the OGA interference must be "in part at least, physical in nature"). Milligan's undisputed subjective belief that Kurti had not properly served process does not convert his actions into those of the objectively reasonable officer. The material and genuine differences in the parties' narratives preclude these § 1983 claims from being susceptible to

summary judgment, even under the "arguable probable cause" standard required by the qualified immunity analysis.

Accordingly, both of Plaintiffs' constitutional claims for false arrest and false imprisonment, along with their state law analogs, survive Defendants' motion.

### 2.   Malicious Prosecution and Abuse of Process

As discussed *supra*,[15] under both New York law and § 1983, a summons alone cannot give rise to a malicious prosecution claim. *See, e.g.*, *Garrett v. Port Authority of New York & New Jersey*, 2006 WL 2266298, at *7 ("Absent the initiation of proceedings, a court appearance pursuant to the summons alone cannot give rise to a malicious prosecution claim."). Moreover, with respect to abuse of process, Plaintiffs have produced no evidence in the record from which a factfinder could conclude that Defendants "sought to bring about a collateral objective separate and distinct from any malicious intent to initiate proceedings against him." *Stewart*, 2008 WL 1699797, at *9. No record evidence suggests that Milligan or Dolan attempted to abuse the system after the issuance of the summonses, in such a way that would give rise to an abuse of process claim. Accordingly, summary judgment is granted for Defendants on Plaintiffs' malicious prosecution claims and abuse of process claims.

### 3.   Excessive Force

Both Kurti and Flores assert in their original complaint that Dolan and Milligan subjected them to excessive force during their arrests. (Compl., Dkt. No. 22, at ¶¶ 161-162, 222-25.) Defendants seek summary judgment on these claims on qualified immunity grounds.

---

[15] The standards for malicious prosecution and abuse of process are addressed in §§ III.B.2 and III.B.6.

An inability to grant summary judgment with respect to a false arrest claim does not necessarily preclude summary judgment with respect to excessive force, as the inquiries are quite separate. An otherwise lawful arrest, supported by probable cause, can give rise to a claim for excessive force where such force is used. In contrast, even where there is no probable cause, and thus a viable claim for false arrest or imprisonment, the force used by the officers still could constitute objectively reasonable restraint. *Cf. Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007) ("Therefore, the proper inquiry at [the summary judgment] stage is into the reasonableness of the force allegedly used in the course of the arrest, given the circumstances described in the record, viewed in the light most favorable to plaintiff.").

Here, Flores has produced no record evidence that his April 16 arrest involved an excessive use of force. He was undisputedly handcuffed, frisked, and placed in a cell—actions which, if not supported by probable cause, are certainly reflective of a viable constitutional claim for false arrest. However, a claim for excessive force will generally not arise from standard handcuffing alone unless the cuffs are unreasonably tight or the arrestee reports discomfort and officers ignore his pleas. *See, e.g., Estes-El v. New York*, 552 F. Supp. 885, 890 (S.D.N.Y. 1982) ("Plaintiff next alleges that he was handcuffed too tightly, shackled to a wall, and forced to remove his headgear. None of these actions, without a showing of further force or damage, rises to the level of a constitutional wrong."). Where, as here, an arrestee suffered no physical injury, no physical discomfort, not even fleeting pain, and where the officers' actions were objectively reasonable under *Graham*, a claim for excessive force will not lie. Accordingly, Defendants' motion for summary judgment on Flores' excessive force claim is granted.

By contrast, under Plaintiffs' version of the facts, Kurti's arrest does indeed raise an issue of material fact as to excessive force. Kurti alleges that she attempted to leave the Precinct after

serving the papers, but Milligan followed her, attempting to give the papers back. She states that when she explained that she had properly served the papers, Milligan grabbed her, handcuffed her on the stairs outside, and brought her back into the Precinct. (Dkt. No. 62, at ¶ 21.) Kurti also stated in her deposition that when Milligan grabbed her, and later, when Dolan grabbed her, she suffered pain due to the severity of the contact. (Kurti Dep., 113:20-115:25.) Given that Kurti was a lone woman, allegedly attempting to leave the Precinct after properly serving process, there is a genuine dispute as to the material fact of whether it was objectively reasonable for an officer to grab and handcuff Kurti under these circumstances. Moreover, the absence of long-term injury does not necessarily preclude Kurti's claim as a matter of law. *See Robison*, 821 F.2d at 924 ("While Robison did not seek medical treatment for her injuries, and this fact may ultimately weigh against her in the minds of the jury in assessing whether the force used was excessive, this failure is not fatal to her claim. If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."). Importantly, Defendants vehemently contend that none of these events happened, arguing that Kurti yelled, screamed, threw papers at Milligan, and was arrested inside the Precinct. (*Id.*) However, on a motion for summary judgment, the movant's narrative cannot be dispositive where it is genuinely disputed by competent evidence offered by the non-movant, as is the case here.

### 4.   Assault and Battery

Kurti[16] also asserts state law claims of assault and battery against Dolan and Milligan,

associated with her April 16 arrest. In New York, when there is no probable cause for an arrest,

all force employed during that arrest is unlawful. *See Sulwoska v. City of New York*, 129 F. Supp.

2d 274, 294 (S.D.N.Y. 2001) ("If an arrest is determined to be unlawful, any use of force against

a plaintiff may constitute an assault and battery, regardless of whether the force would be

deemed reasonable if applied during a lawful arrest."); *Johnson v. Suffolk Cty. Police Dep't*, 245

A.D.2d 340, 341, 665 N.Y.S.2d 440 (2d Dep't 1997) ("As the arrest of the plaintiff by the

defendant police officer Stephen E. Brussell was unlawful, Brussell committed a battery when he

touched the plaintiff during that arrest."). Because these state law claims are directly linked to

this Court's conclusions on false arrest and imprisonment, Kurti's assault and battery claims also

survive summary judgment, as there are issues of material fact related to the probable cause for

her arrest.

### 5.   Emotional Distress

As discussed *supra*,[17] intentional and negligent infliction of emotional distress are

disfavored claims in New York courts, and have a rigorous standard. Here, nothing in the record

suggests that Dolan or Milligan acted outside "all possible bounds of decency," *Murphy*, 58 N.Y.

2d at 303. This conclusion is not intended to undermine the seriousness of false arrest and

imprisonment claims, but rather highlights the uniquely rigorous requirements of a successful

intentional infliction of emotional distress claim. *See* Restatement (Second) of Torts, § 46(1),

---

[16] In their cross-motion for summary judgment, Plaintiffs *both* purport to present claims of assault and battery. (Dkt. No. 57, at 18-19.) However, as Flores did not assert this claim in the operative complaint, it is beyond this Court's inquiry here.

[17] This tort is discussed *supra*, at § III.A.7, with respect to the September 29 incident.

comment d ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."). Accordingly, Plaintiffs' infliction of emotional distress claims do not survive summary judgment.

### D.  New York State Constitutional Violations

Summary judgment must be granted in favor of Defendants with respect to Plaintiffs' myriad New York constitutional claims. As part of their tenth cause of action, Plaintiffs assert nine claims under Article I of the New York State Constitution,[18] alleging violations ranging from malicious prosecution to excessive force. (Compl., Dkt. No. 22, at ¶¶ 225-27.) The rights implicated in these state constitutional claims are more than adequately asserted through Plaintiff's other, multiple counts. In fact, the specific language of the state constitutional claims overlaps consistently with that of Plaintiff's § 1983 claims, asserting, *inter alia*, "excessive force," "false arrest," "malicious prosecution," and unlawful infringement of "protected speech." (*Id.*) Moreover, while the New York Court of Appeals has recognized a limited private right of action for violations of the search and seizure provisions of the state constitution, the remedy is unavailable "where an alternative remedy will adequately protect the interests at stake." *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 628-29 (S.D.N.Y. 1999), *abrogated on other grounds by Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F. 3d 268 (2d Cir. 1999) (addressing joint participation of private and state actors under Section 1983).

---

[18] Plaintiffs argue that Defendants violated  Article I, §§ 6, 8, 11, 12 of the New York State Constitution, abridging Plaintiffs': freedom to engage in protected speech; freedom from deprivation of liberty without due process of law; freedom from unreasonable seizure, including excessive force; freedom from arrest without probable cause; freedom from false arrest, imprisonment, and unjustified detention; freedom from the lodging of false charges; freedom form malicious prosecution; freedom from abuse of process; and equal protection under the laws. (Second Amended Complaint, Dkt. No. 22, at ¶¶ 225-27.)

The due process provision of Article I, § 6 of the New York State Constitution does "define[] a judicially enforceable right and provide[] a basis for relief against the State if the right is violated." *Remley v. State*, 665 N.Y.S.2d 1005, 1008 (Ct. Cl. 1997). However, New York courts do not always hold that a self-executing provision of the state constitution supports a claim for damages, noting instead that "a constitutional tort remedy should only be implied where it is necessary to ensure the effectiveness of the provision and appropriate in furtherance of its purpose." *Id.* at 1009 (citing *Brown v. New York*, 89 N.Y.2d 172 (N.Y. Ct. App. 1996)). Thus, courts tend to recognize civil damages remedies for violations of state constitutional provisions only "where the alleged violation [does] not fit within the definition of any common law tort remedy." *Id.* at 1008. Here, Plaintiffs have not only asserted federal analogs of their state constitutional claims under § 1983, but also have included several corresponding state law tort claims, including: malicious prosecution, false arrest, assault, and battery. Thus, given "that the common law and constitutional remedies seek to redress the same ills[,] . . . no useful purpose would be served by implying a remedy under the [state] constitution and therefore, the causes of action alleging violation of Article 1, §§ 6, 11 & 12 of the New York State Constitution lack an appearance of merit." *Remley*, 665 N.Y.S.2d, at 1009.

### E.  Negligence Claims against the Individual Defendants

Summary judgment must also be granted for Defendants on all of Plaintiffs' negligence claims. In their thirty-second cause of action, all three Plaintiffs assert an alternative theory of liability and recovery sounding in negligence, alleging that all Defendants failed to exercise due care in carrying out their official duties. However, New York Law does not provide a separate cause of action under such a tort theory. Instead, "[a] plaintiff may seek recovery only through the traditional tort remedies of false arrest, false imprisonment and malicious prosecution."

*Rheingold v. Harrison Town Police Dept.*, 568 F. Supp. 2d 384, 395 n.3 (S.D.N.Y. 2008); *see also Bernard*, 25 F.3d at 102 ("Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution."); *Boose v. City of Rochester*, 71 A.D.2d 59, 62, 421 N.Y.S.2d 740, 744 (1979) ("The jury in this trial was asked to decide in essence, whether the police had been negligent in their preparation of plaintiff's assault case. Plaintiff may not recover under broad general principles of negligence, however, but must proceed by way of the traditional remedies of false arrest and imprisonment and malicious prosecution."). Thus, summary judgment must be granted for Defendants as to Plaintiffs' negligence claims.

### F.  Respondeat Superior Liability

Plaintiffs also assert claims against the City under the theory of respondeat superior. This theory of liability is not available for § 1983.[19] *See Monell v. Dep't of Social Serv.*, 436 U.S. 658 691 (1978) ("[T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." (emphasis in original)). Thus, even where Plaintiffs' § 1983 claims survive summary judgment, their claims of municipal liability, under the theory of respondeat superior, will not.

---

[19] Judge Castel ordered a bifurcated trial of Plaintiffs' *Monell* claim against the City, which derive from their § 1983 claims, pending resolution of the individual claims. Thus, this Court does not address the *Monell* claim here. (Order, No. 09-Civ-10464, Apr. 20, 2011, Dkt. No. 32.)

However, "[u]nlike cases brought under § 1983, municipalities may be liable for the common law torts, like false arrest and malicious prosecution, committed by their employees under the doctrine of *respondeat superior*." *L.B. v. Chester*, 232 F. Supp. 2d 227, 239 (S.D.N.Y. 2002) (emphasis in original). In fact, "[t]his [theory] applies even to discretionary actions by police officers where, as here, genuine issues of material fact exist as to whether there was probable cause for arrest." *Sankar v. City of New York*, 07 Civ. 4726, 2012 WL 1116984, at \*12 (E.D.N.Y. Mar. 30, 2012). Thus, under New York state law, municipalities can face liability for claims such as false arrest, assault, and battery under a theory of respondeat superior. *Id.* Accordingly, where Plaintiffs' state law claims survive, so too do their respondeat superior claims against the City.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part; and Plaintiffs' motion for partial summary judgment is DENIED:

1.  Summary judgment is GRANTED dismissing this action as to the NYPD and the unnamed John Does.

2.  With respect to the September 29, 2008 incident: (a) summary judgment is GRANTED in favor of Defendants on both Mesa's state and federal claims; (b) summary judgment is DENIED with respect to Flores' false arrest and imprisonment claims; (c) summary judgment is GRANTED in favor of Defendants as to Flores' malicious prosecution, abuse of process, excessive force, First Amendment, Equal Protection, and infliction of emotional distress claims.

3.  With respect to the April 16, 2010 incident: (a) Plaintiffs' motion for summary judgment is DENIED in its entirety; (b) Defendants' motion for summary judgment is DENIED

as to Plaintiffs' false arrest and imprisonment claims; (c) summary judgment is GRANTED in favor of Defendants as to Plaintiffs' malicious prosecution, abuse of process, and infliction of emotional distress claims; (d) summary judgment is GRANTED in favor of Defendants as to Flores' excessive force claim; (e) summary judgment is DENIED as to Kurti's excessive force claim; and (f) summary judgment is DENIED as to Kurti's assault and battery claims.

4. Summary judgment is GRANTED in favor of Defendants on all New York State constitutional claims, and all negligence claims. Summary judgment is DENIED with respect to those respondeat superior claims arising from state law claims that survive summary judgment under this Order.

The Clerk of Court is directed to close the motions at docket numbers 40, 43, and 54.


SO ORDERED.

Dated: New York, New York
        January 3, 2013

_____
J. PAUL OETKEN
United States District Judge